UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>   v.<br><br>KARL SENNERT,<br><br>            Defendant. | Case No. 6:15-MJ-00003-MJS<br><br>**MEMORANDUM AND OPINION** |

Trial in this case was held before the undersigned on August 6, 2015 in the Yosemite Courthouse of the Eastern District of California. At the conclusion of the trial and upon submission of the case for decision, the undersigned found Defendant guilty as charged on Count 1 (improper disposal of human body waste in violation of 36 C.F.R. § 2.14(a)(8)) and Count 2 (disorderly conduct by creating a hazardous or physically offensive condition in violation of 36 C.F.R. § 2.34(a)(4)). This memorandum outlines the documentary evidence and trial testimony the Court considered, the Court's analysis of same, and its findings and conclusions.

**I.    The Evidence**

On October 8, 2014, at approximately 5:00 P.M., Defendant Karl Sennert was driving, reportedly alone, eastbound on Tioga Road, (Highway 120) in Yosemite National Park. He was driving a Ford F250 pickup truck to which was attached, and

being towed, a 45-foot Voltage "fifth wheel" trailer/recreational vehicle (hereinafter referred to at times as the "trailer" or "RV"). The trailer was equipped with a built-in 175 gallon, fresh water storage tank which Defendant Sennert reports he had filled to excess before leaving his home in Arnold, California that morning. The trailer also was equipped with a built-in 100 gallon holding tank for the accumulation of "black water" (human waste) from the trailer's toilet.

Defendant Sennert asserts that while driving along Tioga Road on October 8, 2014, a loose electrical connection between the pickup truck and the trailer caused a "Trailer Disconnected" message to appear on the pickup's dashboard display. (*See* Exhibit B19.) This indicated that the electrical connection between the truck and trailer had come loose, rendering the electrical brakes on the trailer inoperable and the entire system dangerously dependent on the pickup truck's brakes to stop both truck and very heavy 45 foot RV. Defendant, who characterized himself at trial as a very experienced and careful operator of vehicles being towed, noted in effect that it would be hazardous to start down the east side of the very steep and windy Tioga Pass Road with a 45-foot trailer without assurances all brakes were working properly. Accordingly, when the "Trailer Disconnected" message appeared, Defendant pulled over into the first turnout, which happened to be on the north side of the road, just east of the May Lake Road junction with Tioga Road, and again about five miles further east on a turnout on the south side of Tioga Road near Tioga Lake. In both instances, he successfully adjusted the electrical connection between the pickup and the trailer to reconnect the brakes and then was back on his way. He testified that he saw no sewage or anything unusual at the May Lake stop.

While Defendant Sennert was stopped on the north side of Tioga Road as just described, an automobile, in which Bradley Fox was a right front seat passenger and Kathy Camp was a left rear seat passenger, pulled in behind, and to the right, of Defendant Sennert's parked pickup and trailer. According to Ms. Camp's subsequent

2

written statement to the National Park Service (Exhibit D1.) and her fully consistent trial testimony:  As her car pulled in, her window was down a crack and she smelled something like sewage or feces.  She then looked down to the left and "saw a 'stream' flowing from the side-left of [Sennert's] RV- not sure if it was flowing under RV, but I saw a stream **flowing**." Id. (emphasis in original).  Camp rolled down her window, found the odor of sewage horrible, and confirmed that what she saw was dirty brown, apparently human, waste.  She then saw Defendant Sennert " . . . get in his truck (white), slam the door, and then the tires squealed, seeming like he was trying to book it out of there . . ." Id.

Fox described the sequence: "As we approached, the driver quickly got into his truck and pulled away.  As the the (sic) vehicle pulled forward a stream of sewage was flowing from under the trailer."  (Exhibit D2.)[1]  He reiterated at trial that he saw human feces on the ground and "flowing", in motion down the hill from below where the RV was located.

Camp encouraged her driver to follow the truck and RV.  As they pulled out, Camp noticed the "stream" had a "poop-log" in it. (Exhibit D1.)  When, after some unspecified distance, the Camp car caught up with the RV, Fox photographed the license plate.  Sennert then pulled over to the right.  He subsequently explained that he did so because his "Trailer Disconnected" warning had reappeared.  Camp's car passed Sennert; as it did, Sennert rolled down his window in a way that caused Fox to think he wanted to talk to him.  Camp's car kept going, and Camp photographed Sennert in the truck's driver seat as the Camp car passed the RV. Id.

According to the testimony of Camp and Fox, they continued on for some unspecified distance and came upon a National Park Ranger vehicle getting ready to pull out onto Tioga Road.  They stopped and reported to Ranger Sally Sprouse what

---

[1] Fox's written report adds: "The driver was emptying the sewage tank from the trailer." (Exhibit D2.)  However, on examination at trial, both he and Camp acknowledged that they did not actually see the sewage emanating from the underbody of the RV.

3

they had seen. As they were talking to her on the side of the road, Sennert and the trailer passed them. This was pointed out to Ranger Sprouse who followed after Sennert and pulled him over to question him about a report of waste having been discharged from his RV.

Sennert was open and cooperative but adamant that he had not discharged any waste, or anything else, and in fact had had no waste in his RV at any time on the trip. He explained that he had pulled over twice only to reconnect his loose electrical line. He maintained on October 8, 2014 and testified at trial that the black water holding tank had been emptied at the end of a prior trip to June Lake, well before he began his trip on October 8, 2014, and that it remained empty at all times during the October 8, 2014 trip. He explained that he never travelled with waste in his waste tanks; doing so would needlessly increase weight, lower efficiency, and create safety concerns. At trial, he also noted that traveling with waste in his holding tank was grounds for forfeiture of the trailer manufacturer's warranty. He said he had a disposal system on his residential property and would dispose of waste, if any, there rather than travel with it.

Ranger Sprouse noted water dripping from the trailer. Defendant explained that when the water storage tank was overfilled (as it was on October 8) and/or when its plastic tank expanded as a result of natural forces, fresh water would be emitted through an overflow valve surrounding the water tank filler pipe, spill into the surrounding compartment (shown on Exhibit B4) and then spill out onto the roadway, especially when the trailer tilted on curves or otherwise. At trial, Sennert also said there had been another leak from a broken strap that day. He said that although fresh water was available at his destination, he had overfilled his water tank before starting on his trip, and it had been leaking about 75% of the way. He suggested that perhaps someone had seen clean water dripping out and mistaken it for sewage.

4

Sennert pointed out the black water discharge outlet location near the clean water discharge line, in front of the trailer's triple axles.  He crawled under the truck to demonstrate a discharge (actually, a flood, per the video made by the Ranger) of clean water coming out when he opened the fresh water valve.  He also advised that discharge of black water necessitated that he open the valve cap at the discharge outlet and then, as a second step, return forward along the trailer at least six or eight feet to release a lever near where the fresh water filler and overflow valve were located, to enable the black water flow to start.  He said he would not open or close the black water discharge outlet without wearing gloves as there would be residual sewage discharge on the outlet.  (No gloves were requested to be seen by the Rangers or shown to them.)  He advised that the sewage would flow naturally from gravity if the cap were removed and the lever pulled; no pumping or other pressure was needed.

Ranger Sprouse concluded that Sennert's explanation made sense, and so, after obtaining Sennert's identification, and his voluntarily offered phone number, she sent him on his way, advising she would be in touch if necessary.  Regrettably, she made no specific investigation of the underside of Sennert's truck or the black water disposal outlet for signs of waste splatter.  She saw no signs of any such thing while talking to Sennert.  She did not smell sewage.  Neither did fellow Ranger Rebecca Church who was present near the trailer.  Neither Ranger asked to investigate further or made any further inspection of the trailer, the truck, or Sennert.

They both returned to the scene of the alleged waste dump and confirmed, based on observation and experience, that what was there was "unquestionably raw human waste", covering an area approximately 50 feet long and 10 feet wide.  Both described it in their testimony as still wet, but not flowing.  Sprouse saw puddles, but Church did not.  The sewage had flowed into a culvert leading to a small lake.  Clean up crews were called and spent some six hours cleaning up the site at a cost of $1237.05.  The sewage was not sampled or tested.

5

## II. Findings

From the foregoing and the parties' written stipulation (ECF No. 14.), the Court makes the following findings:

1. Defendant Sennert was the individual operating the truck and Voltage trailer which was pulled over into a turnout on the north side of Tioga Road, just east of its junction with May Lake, in Yosemite National Park, when witnesses Camp and Fox pulled in behind him in the same turnout on October 8, 2015.

2. Defendant Sennert made what both Fox and Camp characterized as a quick departure soon after they pulled up behind him in the turnout.

3. While stopped behind Sennert's truck and trailer at the turnout on the north side of Tioga Road, Fox and Camp saw what proved to be human fecal waste and sewage "flowing", in motion, down the hill from an area under and to the left side of Sennert's trailer.  The black water disposal outlet was located on the left side of the bottom of the trailer and in front of its wheels and axles.

4. Defendant Sennert denied seeing or even smelling the sewage which Camp and Fox saw "flowing" and which they described as a horrible odor which was detectable by Camp when her car window was only slightly open.

5. The sewage was not flowing when Rangers Church and Sprouse visited the scene.

6. The clean water leaking from Sennert's trailer as observed by Sprouse and described by Sennert, was not of sufficient volume to cause solid human fecal matter (a "poop-log" according to witness Camp) to flow down the pavement.

7. Witnesses Camp and Fox, rightly or wrongly, clearly believed that Sennert had emptied his trailer's toilet waste onto the pavement at the turnout where

they first encountered him. Both made very credible witnesses in that they went to considerable length and inconvenience to pursue one they believed had committed a crime; they traveled to Yosemite and testified at the trial; they testified fully consistently, on direct and cross examination, with statements they gave on the day of the incident; they admitted that they did not actually see sewage emanating from the body of Sennert's vehicle.

8. There is no evidence any other vehicle carrying waste was at the scene while Sennert, Fox, and Camp were there and the latter two saw solid human waste "flowing." Sennert did not see any such waste or discharge as he pulled into the turnout or as he exited his vehicle to reconnect his electrical connection.

9. Defendant Sennert was the individual operating the truck and trailer, and the one who pulled it over to the side of the road near Tioga Lake, when Camp and Fox caught up with it and took pictures of it and of Sennert as he pulled over, rolling down his window and looking at them in a way they believed indicated he wanted to say something to them.

10. It is possible, but not credible to believe, that Sennert happened to stop at a point where someone had just completed a discharge of human waste from a storage tank (and done so recently enough prior to Sennert stopping, getting out of his vehicle, and reconnecting his electrical connection and before Fox and Camp even pulled up behind him) so that solids in the discharge were still flowing out from under Sennert's trailer and without Sennert noticing the discharge.

11. It is possible, but not credible to believe, that Sennert just happened to stop to fix his electrical connection a second time just as Good Samaritans Fox and Camp were photographing him and his truck and that he just happened

7

to roll down his window as he slowed and they passed him in what they perceived to be an indication he wanted to talk to them.

12. Sennert's statements and testimony raise the following questions as to his credibility: A) Why would one so concerned, as he claimed to be, about the danger and costs of unnecessarily carrying extra weight in his waste storage tank carry an over-filled, 175 gallon, fresh water tank when, as he testified, there was fresh water available where he was going? B) Why would one as trailer safety conscience and experienced as Sennert described himself to be, be willing to continue traveling down a known extremely steep and windy descent with a loose electrical connection, which disconnected itself at least twice in a stretch of about five miles, and had the potential of leaving him dependent on truck brakes to slow or stop the very heavy and large trailer packed with an ATV and camping gear for eight? C) Is it not somewhat incredible to believe that Sennert needed to stop and reconnect his electrical line just exactly at the point where the people following and photographing him were passing him? And, D) Why does one pulling over to check a dangerously loose electrical connection need to first roll down his window and look as if he wanted to talk to individuals who had been photographing him? And, E) Why would one discharging black water from the RV's storage tank expect sewage to have splattered on him he would have had to move some six to eight feet away from the discharge outlet to release the lever that allowed the discharge to flow out.

13. Other facts that the defense argued militated in its favor are not negative for the defense, but neither are they persuasive: A) Sennert testified that he would not have opened the black water discharge outlet without wearing gloves. No gloves were produced or requested. The evidence does not establish that gloves were not worn. B) The Rangers did not see any waste

8

   splatters on the trailer or its wheels. Regrettably, through no fault of Defendant, they did not look. But, the trailer had traveled something in excess of five miles and some unspecified amount of time ("less than 30 minutes") before it was stopped by the Rangers; it is reasonable to believe that any such materials would have been blown off and/or dried in the interim. The absence of evidence of same is not evidence it was not there. C) The only evidence the trailer waste tank was empty at the outset of the trip is from Defendant.

14. The Court questioned why Defendant, or anyone with his experience traveling with an RV through a National Park, would suddenly stop in a public turn out along a well-travelled highway, and discharge human waste. Beyond speculation, the answer to the puzzle remains unknown, but the unanswered question is not such as to bring reasonable doubt to the conclusion reached here.

### III.   Analysis

Given the Court's findings, the Court has concluded beyond a reasonable doubt that Defendant Sennert discharged human waste from his RV on October 8, 2014, on Tioga Road, within the boundries of Yosemite National Park and the United States.

This does not mean the conclusion is reached with absolute certainty. Indeed, the Court itself raised questions at trial and above, mainly as to motive, to which answers remain elusive. However, the law does not require or expect absolute certainty or an absence of all doubt. It requires only that the conclusion be free from reasonable doubt. *Miles v. United States*, 103 U.S. 304, 312 (1880) ("The evidence upon which a jury is justified in returning a verdict of guilty must be sufficient to produce a conviction of guilt, to the exclusion of all reasonable doubt."); *In re Winship*, 397 U.S. 358, 364 (1970) ("we explicitly hold that the Due Process Clause protects the accused against conviction

except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.").

Given: 1) the credibility of the Good Samaritan witnesses Fox and Camp; 2) the questions as to Defendant's credibility; 3) the unlikelihood that Defendant just coincidentally stopped to check his electrical connection where fresh sewage was being dumped, or had been dumped immediately before, without him seeing or smelling it (despite its odor being strong enough for Camp to smell it with her window only open a bit and both Fox and Camp to be virtually overwhelmed by it); 4) Fox and Camp seeing the sewage coming from an area under Defendant's RV where the waste tank disposal outlet was located; 5) Defendant's quick departure from the scene when Fox and Camp pulled in behind him; 6) the unlikelihood of Defendant's electrical connection coming loose again at precisely the point where Fox and Camp pass him; and, most significantly, 7) that the witnesses Fox and Camp were consistent and adamant that they saw sewage, including solid human waste, "flowing" down from an area beneath Defendant's RV, the Court has no reasonable doubt that Defendant caused or allowed the subject discharge of human waste in Yosemite National Park.

Count 1 charges Defendant with violating 36 C.F.R. § 2.14(a)(8). This statute prohibits: 1) the disposal of human body waste, 2) in developed areas unless at a designated location or fixture. *See* 36 C.F.R. § 2.14(a)(8). Witnesses Fox and Camp concluded that what they saw and smelled flowing on the ground to be human sewage. Rangers Sprouse and Church, based on their observation and experience, determined that the substance was "unquestionably raw human waste." There was no claim nor evidence it was anything else. The area in which it was found was a turn out, not a designated waste disposal site.

Count 2 charges Defendant with disorderly conduct in violation of 36 C.F.R. § 2.34(a)(4). The essential elements of this offense are: that the defendant (1) either (a) with the intent to cause public alarm, nuisance, jeopardy or violence or (b) knowingly or

recklessly creating a risk thereof, (2) created or maintained a hazardous or physically offensive condition (3) on land subject to the legislative jurisdiction of the United States. *See* 36 C.F.R. § 2.34(a)(4).

The Court is convinced beyond a reasonable doubt that the sight and smell of human waste covering an area approximately 50 feet long and 10 feet wide is a physically offensive condition that would cause public alarm and/or nuisance.  And, it in fact did so here to witnesses Fox and Camp.  They were sufficiently alarmed and offended by the sight and smell of the sewage flowing to pursue the party they believed to be responsible for it. As noted, the evidence supports the conclusion beyond a reasonable doubt that Defendant was indeed the one who created the condition in Yosemite National Park within the jurisdiction of the United States.

IT IS SO ORDERED.

Dated:   September 9, 2015              /s/ *Michael J. Seng*
                                        UNITED STATES MAGISTRATE JUDGE