1

2

3

4

5

6

# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | 1:16-cr-00013-LJO-1 |
| Appellee-Plaintiff, | |
| v. | ORDER DENYING APPEAL OF CONVICTION |
| KARL SENNERT, | |
| Appellant-Defendant. | (Doc. 35) |

## INTRODUCTION

On August 6, 2015, following a bench trial, Magistrate Judge Seng found Appellant Karl Sennert ("Sennert") guilty of violating 36 C.F.R. § 2.14(a)(8), disposing of human body waste (Count One) and 36 C.F.R. § 2.34(a)(4), disorderly conduct by creating a hazardous and physically offensive condition (Count Two). At the January 26, 2016 sentencing hearing, Magistrate Judge Seng sentenced Sennert to twelve months of unsupervised probation, with the condition that he pay a $1,000 fine and $822.80 in restitution to the government. Sennert now appeals his convictions on the grounds that (1) the Magistrate Judge improperly denied his Federal Rule of Criminal Procedure 29 ("Rule 29") motion and (2) there was insufficient evidence to sustain his convictions. In the alternative, Sennert seeks remand for a new hearing on the issue of the Magistrate Judge's order of restitution for lost employee time. For the reasons that follow, the Court will affirm Sennert's convictions and sentence.

//

//

//

**BACKGROUND**

**I. Undisputed Facts**

On October 8, 2014, at approximately 5:00 PM, Sennert was driving alone, eastbound on Tioga Road, Highway 120, in Yosemite National Park. Stipulated Facts for Trial (Doc. 14)[1] at 1. He was driving a Ford F250 pickup truck, which was towing a 45-foot Voltage "fifth wheel" trailer/recreational vehicle ("RV"). *Id.* The trailer was equipped with a built-in 175-gallon fresh water holding tank and a 100-gallon blackwater holding tank for the accumulation of waste from the RV's toilets. *Id.* at 2.

While Sennert was stopped on the north side of Tioga Road, an automobile in which Bradley Fox ("Fox") and Kathy Camp ("Camp") were passengers pulled in behind Sennert's RV. *Id.* Sennert then entered his pickup and drove away. *Id.* Fox and Camp noticed liquid on the ground under Sennert's RV. *Id.* Upon observing the liquid more closely and smelling its odor, Fox and Camp concluded the liquid was human waste. *Id.* Subsequent inspection of the liquid led investigating National Park Service Enforcement Rangers Rebecca Church ("Ranger Church") and Sally Sprouse ("Ranger Sprouse") to conclude that it was human waste covering an area approximately 50 feet long and 10 feet wide. *Id.*

On January 23, 2015, the government filed the initial complaint in this case, alleging that Sennert violated 36 C.F.R. § 2.14(a)(8) and 36 C.F.R. § 2.34(a)(4). Doc. 1. Sennert entered a plea of not guilty to both charges on March 17, 2015. Doc. 7. Following a status conference on May 19, 2015, the case was set for a bench trial on August 6, 2015 before Magistrate Judge Seng. Doc. 10.

**II. August 6, 2015 Trial Proceedings**

On August 6, 2015, a bench trial convened. Trial Transcript (Doc. 16) at 1. The government called as witnesses Ranger Church, Camp, Fox, and Ranger Sprouse, in that order. *Id.* at 21-91. At the close of the government's evidence, the defense moved for a judgment of acquittal under Rule 29. *Id.* at 91. The Magistrate Judge denied the motion. *Id.* at 95. The defense then called Sennert as its only witness. *Id.* After Sennert's testimony and closing arguments, the Magistrate Judge found Sennert guilty of both counts. *Id.* at 165.

---

[1] The parties have stipulated that these facts are fully supported by the evidence and not in dispute.

1    A. Government's Evidence

2        *1. Ranger Church Testimony*

3        On October 8, 2014, Ranger Church was a seasonal park ranger assigned to the Tuolumne

4    Meadows Subdistrict, a position she held periodically since June of 2013. *Id.* at 22-23.  Ranger Church

5    had previously received "extensive" investigative training at Southwestern Community College in

6    Franklin, North Carolina. *Id.* at 30. However, she had never investigated an improper sewage disposal

7    case before October 8, 2014. *Id.* at 24. From her experience as a park ranger, she was very familiar

8    with Tioga Road, having traveled down the road every day she worked. *Id.* at 24. She described the

9    turn-out as "on a slope." *Id.* at 25. Based on her experience, she estimated that over a hundred vehicles

10   traveled down Tioga Road during the fall months on a given day, of which only a "small percentage"

11   were RVs. *Id.* at 30-31.

12       On October 8, 2014, Ranger Church received a call from Ranger Sprouse, who requested that

13   Ranger Church meet with a party who had witnessed someone dump sewage from an RV on the side of

14   the road near May Lake. *Id.* at 23-24. Ranger Church responded to the reporting party's location,

15   where she spoke with Fox. *Id.* at 31. Ranger Church testified that Fox was upset and eager to talk to

16   her. *Id.* at 31-32. Fox showed Ranger Church photos he had taken of Sennert's RV farther down the

17   road from the scene of the incident. *Id.* at 32. After speaking with Fox, Ranger Church left to assist

18   Ranger Sprouse with the stop of Sennert's vehicle. *Id.* There, Ranger Church stood next to Sennert's

19   RV, though she did not examine the trailer for signs of sewage. *Id.* at 33. However, she asserted that

20   she was only there to watch out for the safety of Ranger Sprouse, whom Ranger Church described as

21   the "main investigator" in the case, and thus Ranger Church was not looking for signs of sewage. *Id.*

22   After the encounter with Sennert, Ranger Church traveled to the scene of the incident. *Id.* at 34.

23       Ranger Church testified that the turn-out was a public area, as it was on the side of the road

24   and accessible to the public. *Id.* at 25. In describing the turn-out, Ranger Church stated, "[i]t's a large,

25   paved pullout. You could probably fit five or six normal cars parked end to end." *Id.* Ranger Church

26   observed a "large spill of brown fecal matter" that "covered a large chunk of [the pullout], maybe

27   approximately 50- by 10-feet." *Id.* The fecal matter looked "wet" to Ranger Church. *Id.* at 27. She did

28   not collect a sample of the fecal matter, though she admitted it would have helped in the investigation.

                                                      3

*Id.* at 34-35.

After inspecting the scene of the incident, Ranger Church drove to a ranger station to retrieve supplies to cordon off the spill area because "it was human waste and that's hazardous." *Id.* 28-29. In addition to cordoning off the area, Ranger Church shoveled dirt into a culvert at the bottom of the pullout in order to prevent the waste from running down the culvert and under the road. *Id.* at 29.

### 2. Camp Testimony

Camp testified that on October 8, 2014, she and Fox had finished hiking at May Lake when the car in which she was a passenger pulled into a turn-out so the passengers could look at a map. *Id.* at 39. Camp was located in the back seat of the car behind the driver with her window cracked. *Id.* at 40. The car stopped behind and to the right of what Camp described as a Voltage fifth-wheel trailer being pulled by a "big white, looked like a diesel-type truck." *Id.* at 45. As they pulled into the turn-out, Camp stated, "I smelled feces. I smelled something, smelled like sewage." *Id.* at 49. She rolled down her window farther, and observed "some kind of brown-looking, dirty stream flowing and then I realized that there was an RV, or what looked like an RV. It said Voltage on it and … there was [a] stream flowing." *Id.* 40-41. Camp saw "what appeared to be feces" flowing from the left side and underneath the RV. *Id.* 42-43. There were no other RVs between Camp and the RV she believed dumped the sewage. *Id.* at 44-45. After Sennert left the turn-out, Camp observed a "pile of feces" where the RV had been parked.[2] *Id.* at 42. However, she never actually saw sewage flowing directly from the RV or Sennert actually dumping the sewage. *Id.* at 51. Further, Camp never spoke with Sennert to confirm her suspicions about what he had done. *Id.* at 55.

When the RV started to pull away, Camp "discussed in the car that [her group] believed that this person was trying to leave the site. So we wanted to follow him and at least take a picture of the plates … to just let somebody else know. So we wanted to follow him, or follow the vehicle." *Id.* at 43. She additionally testified that she observed "a pile of what appeared to be feces" when the RV pulled away. *Id.* at 42. The RV pulled out of the turn-out "awfully fast," seeming "like it was in a hurry to get out of that spot." *Id.* 55. Camp's car followed the RV for "quite some time." *Id.* at 44. When close enough to the RV, Fox took a picture of the plates. *Id.* They continued to follow the RV for "a little

---

[2] There is no dispute that the RV belonged to Sennert. Doc. 14 at 2.

bit," until it pulled over a second time. *Id.* They passed the RV, and when they spotted a ranger parked on the side of the road near a ranger station, they stopped to report the incident. *Id.* at 45. As they were talking to the ranger, the RV passed by and they pointed it out as the RV that had dumped the sewage. *Id.* Camp and Fox made written statements and provided the rangers with a copy of the pictures Fox had taken of the RV. *Id.* at 46.

### 3. Fox Testimony

Fox testified that, shortly after he and his group left May Lake after a hike, the driver of the car in which Fox was a front-seat passenger pulled into a turn-out to look at a map. *Id.* at 59-60. There, Fox smelled a strong, distinct smell of sewage. *Id.* at 60. Fox's car was behind an RV that said "Voltage" on the back. *Id.* at 62. The RV was being pulled by a "light-colored" Ford truck. *Id.* at 63. The RV was at the turn-out for less than two minutes. *Id.* at 69. As the RV started to pull away, Fox saw "sewage on the ground flowing that would appear to be coming from out from underneath the RV." *Id.* at 61. Fox did not actually see sewage flowing directly from the RV, nor did he see Sennert outside of the vehicle. *Id.* at 68. Fox never spoke to Sennert to confirm his suspicions. *Id.* at 69.

After the trailer left the turn-out, Fox testified that once he and his group "realized what was happening … [they] wanted to get the license plates from the trailer." *Id.* at 62. There were no other RVs between Fox's car and the RV Fox believed had dumped the sewage, only passenger cars. *Id.* When Fox was close enough, he took pictures of the RV and its license plate. *Id.* After Fox's group passed the RV several miles down the road from the site of the incident, they spotted a ranger parked near a ranger station and stopped to report the incident. *Id.* at 64. While speaking with the ranger, an RV passed by and Fox's group pointed it out as the vehicle they had seen dumping sewage. *Id.* Fox filled out a witness report and gave the ranger his memory card containing the pictures he took of the RV. *Id.* After reporting the incident, Fox's group drove to their campsite. *Id.* at 66. On their way, they passed the site of the incident, and noticed the area had been roped off with caution tape. *Id.*

### 4. Ranger Sprouse Testimony

At the time of her testimony, Ranger Sprouse had been a supervisory park ranger since 2007. *Id.* at 76. She was trained at a seasonal law enforcement academy in 1995 and the Federal Law Enforcement Training Center in 2001. *Id.* She was trained in investigating improper sewage disposal

cases and had investigated "several" such cases. *Id.* at 82-83. In her experience investigating these cases, the sewage was "usually either on the road or at a campsite, or something." *Id.* at 82. She had never collected samples of sewage. *Id.* at 83.

Ranger Sprouse was normally assigned to duty in Tuolomne Meadows. *Id.* She was familiar with Tioga Road, and estimated that "probably a couple thousand, or maybe over a thousand" vehicles traveled down the road during the fall on a given day. *Id.* Ranger Sprouse estimated that a "small percentage" of these vehicles were RVs. *Id.*

On October 8, 2014, while parked on the side of the road, Ranger Sprouse was approached by Fox, who told her that an RV had dumped sewage at a turn-out just east of May Lake Junction. *Id.* Fox appeared "eager" to speak with Ranger Sprouse. *Id.* at 84. He told Ranger Sprouse that the RV left the turn-out after dumping sewage and pulled over again at Tenaya Lake. *Id.* at 77-78. Fox showed Ranger Sprouse pictures he took of the RV. *Id.* at 78. During this encounter an RV passed by, and Fox pointed it out as the RV that had dumped sewage. *Id.* Ranger Sprouse then followed and stopped the RV. *Id.* At trial, Ranger Sprouse identified the operator of the RV as Defendant Sennert. *Id.*

Ranger Sprouse told Sennert that someone had seen him dump sewage. *Id.* at 79. Sennert denied the allegation. *Id.* Sennert explained that water was leaking from his RV from a "pea hole," which Ranger Sprouse estimated to be "about, a little bigger than a quarter, I guess." *Id.* Sennert showed Ranger Sprouse the RV's water draining system. *Id.* at 85. In doing so, Sennert crawled under the RV on his hands and knees. *Id.* at 86. Ranger Sprouse did not observe any signs of sewage on or around the RV, though she did not inspect the RV for sewage. *Id.* at 86-87. She testified that, when investigating sewage dumped from an RV, she would not necessarily inspect the RV for sewage, noting that Sennert had "driven quite a ways from where he had dumped the sewage at that point." *Id.* at 87. While Ranger Sprouse found no evidence of sewage, she noticed a puddle of water on the ground. *Id.* at 87-88. Sennert was cooperative during the stop, and Ranger Sprouse believed that Sennert's explanation that water was leaking from the RV made sense at that time. *Id.* at 85 & 88-89. After completing her contact with Sennert, Ranger Sprouse thanked him and let him go on his way. *Id.*

at 79-80.[3]

Ranger Sprouse then went to the turn-out to investigate. *Id.* at 80. There, she found "a stream of sewage that was just undeniably human sewage." *Id.* The sewage "smelled horrible." *Id.* Ranger Sprouse described the sewage as a 50-foot long stream of "solid" sewage that looked wet, but was not flowing at the time she saw it. *Id.* at 80-82. She then formed the opinion that Sennert was responsible for the sewage. *Id.* at 80. She clarified during re-direct examination that she had not seen the dump site before she conducted the traffic stop of Sennert, when she had momentarily accepted his proffered explanation that Camp and Fox had mistaken the water leaking from his RV for sewage. *Id.* at 89.

B. Rule 29 Motion

At the close of the government's evidence and prior to Sennert's testimony, Sennert moved for acquittal pursuant to Rule 29. *Id.* at 91. The Magistrate Judge denied the motion because, viewing the evidence in the light most favorable to the government, a "reasonable person could find beyond a reasonable doubt that [Sennert] was guilty." *Id.* at 94.

C. Defense's Evidence

*1. Sennert Testimony*

At the time of the incident, Sennert was an "[e]xtremely" experienced RV owner, having interacted with RVs since age six. *Id.* at 102. He obtained his first RV at nineteen. *Id.* He bought the 45-foot Voltage fifth-wheel RV in 2012. *Id.* at 97. He takes the responsibility of RV ownership "very seriously" because "[i]t's extremely" dangerous to tow the RV, especially in the mountains. *Id.* at 103. Since he bought the Voltage RV, he had problems with an electrical connection between the RV and his truck. *Id.* at 104-05. When the electrical connection fails, he loses operation of the RV's six electrical brakes, leaving only the truck's four brakes to stop the weight of the truck and RV. *Id.* at 105. When there is a disconnection, a "trailer disconnected" notification will appear on his truck's dashboard. *Id.* at 103. When such a notification appears, it is important to pull over "[a]s soon as it's safe." *Id.* at 105. Driving with brake problems on Tioga Road was "very nerve-wracking" for Sennert because of the road's steep grade. *Id.* at 127.

---

[3] Ranger Sprouse always used a VeeView recording system while on duty, and the government played a video of her stop of Sennert at trial. *Id.* at 77 & 79.

On October 8, 2014, Sennert was traveling down Tioga Road on his way to June Lake. *Id.* at 100-01. This was a trip he had done "[a] hundred times, probably, with the RV." *Id.* at 105. That day, because the RV was loaded with various recreational vehicles and 175 gallons of fresh water, it weighed between 27,000 and 28,000 pounds. *Id.* at 104. This weight, paired with the brake connection problem, was "very concerning" to Sennert. *Id.* On his way to June Lake, the "trailer disconnected" notification appeared on his dashboard. *Id.* at 106. In response, he pulled over to reconnect the brakes. *Id.* He claimed he did nothing other than reconnect the brakes while he was stopped. *Id.* Sennert estimated that he was stopped at the turn-out for "a minute or a minute and a half-ish, something like that." *Id.* He did not see anyone else while he was at the turn-out. *Id.* He pulled over three times on that trip, and never once saw any vehicles parked behind him or any sewage on the ground. *Id.* at 107. Given where Sennert was located in relation to his RV while reconnecting the brakes, he asserted that it would be "impossible" to see anything behind and to the right of his RV. *Id.* at 108. Further, given his location, he claimed it was possible that had there been sewage underneath his RV he would not have smelled it. *Id.* Moreover, Sennert claims that it is possible he did not smell sewage at the turn-out because he was only outside of his vehicle for a short time and was strictly concerned with fixing his brakes. *Id.* at 127-28.

Prior to October 8, 2014, he had last used the RV on a trip to Grand Sierra Resort in Nevada. *Id.* The campsite where he stayed during this trip contained a dumping station, as did his home and "ninety-five percent" of the places Sennert took his RV. *Id.* at 97. A dumping station consists of drains in the ground to which septic tanks can be connected. *Id.* Sennert asserted that he dumps his sewage tank "before [he] leaves anywhere." *Id.* at 98. He claims to have used the dumping station at June Lake every time he had ever visited the lake. *Id.* at 101. The dumping station at June Lake costs ten dollars to use. *Id.* at 102. The payment device at June Lake did not give Sennert a receipt "except on my bank account through my ATM card or my credit card." *Id.* At trial, he offered to retrieve his phone to look up the receipt on his bank account. *Id.* at 132. He claims to have never traveled with anything in his sewage tank because he already exceeded the weight limits of his truck and "can't afford to carry the extra weight and … for safety reasons for stopping, and such. I just, I can't afford to carry the weight." *Id.* Sennert "would never put [himself] in a position to carry extra weight for no reason when I have a

dump facility at my home and I stayed prior to this trip, I stayed at a full-service dump facility." *Id.* at 125. In addition, traveling with sewage in the holding tank is grounds for forfeiture of the RV's warranty. *Id.* at 123. Sennert admitted that dumping sewage would make his RV lighter and thus much better on his brakes. *Id.* at 120-21. However, he asserted that he always travels with an empty sewage tank not because of weight concerns, but solely to maintain the validity of the RV's warranty. *Id.* at 141.

At trial, Sennert described the process of removing sewage from his RV with the use of a hose and macerator:

> Well, the first thing you'd need to do is, obviously, you get gloves on 'cause' you never know. Something is trapped. Sometimes the valves don't close all the way and so you have the lid on, a cap on, a four-inch cap on the drain and you always want to make sure you got gloves on, or something before you open that. 'Cause' a lot of times when you open it you'll get a little bit of stuff that'll come out that has gotten past the valves and it's trapped inside that line. So you put on gloves. You unscrew that cap and then depending on if I'm going to use my – I have an [sic] macerator. It's an electric macerator. I hook up to it and it virtually grinds everything up, turns it to a liquid, and we'll pump it out an inch hose into a facility, or I can hook up a four-inch drainpipe and hook it up to a drain valve, from the drain valve to that, and then I open up the – there's another compartment forward of the actual hose connection area that's about 15 or so feet forward. And the compartment you have to open and then there's levers inside that compartment that you have to pull to get it to come out. Then you have to repeat, you know. Close those valves. Go to the, the, underneath the RV and put the cap back on and such after you're done with that process.

*Id.* at 99-100. Even if dumping with a hose and macerator, "there's no way around" contaminating his hands, other than wearing gloves. *Id.* at 117. Even using a hose to dump sewage, which limits exposure to the sewage, would reportedly create a detectable odor. *Id.* at 116-17.

Sennert claimed he has never dumped sewage from his RV on a roadside without the use of a hose or macerator. *Id.* at 112. He claimed that it would be impossible to avoid contaminating himself if sewage were dumped roadside. *Id.* at 100. If dumping roadside, sewage would flow very rapidly from the sewage valve, creating a spray. *Id.* at 112. Sennert admitted that it was possible that fifty to one hundred gallons of sewage could be rapidly removed from the trailer. *Id.* at 124. This would create an "enormous mess all over [Sennert's] RV" that "would be rather ugly." *Id.* at 117. Thus, if Sennert had dumped sewage roadside he "wouldn't have wanted [to be] anywhere … near it." *Id.* at 115.

9

Sennert testified that on October 8, 2014 his RV was leaking water in two places because he had overfilled the fresh water holding tank. *Id.* at 109. When the RV's fresh water tank was overfilled and the RV was tilted towards the driver's side, water would leak out of a "pea hose" on the left side of the RV. *Id.* at 109. The valve from which the sewage flows was also located toward the left side of the RV, underneath the RV and in front of its three axles. *Id.* at 110. When leaking from the pea hose, water would "actually squirt, a, you know, a foot out or so if you're not careful." *Id.* at 109. When Sennert was pulled over at the first turn-out, it is possible his RV was tilted slightly toward the left. *Id.* at 110. However, he did not actually see water coming from the area where the pea hose was located. *Id.* at 131. In addition to the "pea hose" leak, overfilling the fresh water tank had previously caused a strap to break, resulting in a second leak directly from the fresh water tank in front of the sewage valve. *Id.* at 114.

Sennert testified that when Ranger Sprouse pulled him over, he explained to her the problem he had been having with his brakes, and showed her the RV's water draining system. *Id.* at 113. In doing so, he crawled "close to the undercarriage" of the RV. *Id.* At trial, the defense played a video of Sennert showing Ranger Sprouse that the liquid leaking from his RV was water, not sewage. *Id.* at 134-35. Sennert testified that if he had dumped sewage from his RV, he would not have been comfortable being as close to the sewage valve as he was when under the RV. *Id.* at 115.

Despite his concern for the weight of his trailer and the availability of fresh water at June Lake, Sennert filled his 175-gallon fresh water tank to excess before his trip. *Id.* at 133. He claims that he always fills up his fresh water tank at home for convenience purposes. *Id.* He claims that it is "too much hassle" to fill the fresh water tank away from his home. *Id.*

D. Conviction

Based upon the evidence presented at trial, the Magistrate Judge found it beyond a reasonable doubt that Sennert had violated 36 C.F.R. §§ 2.14(a)(8) and 2.34(a)(4), and accordingly found Sennert guilty of both counts as charged. *Id.* at 165. The Magistrate Judge explained his reasoning in his September 9, 2015 Memorandum and Opinion (Doc. 17).

//

//

**III. January 26, 2016 Sentencing Hearing**

On January 26, 2010, a sentencing hearing convened. Sentencing Transcript (Doc. 29) at 1. At the end of the hearing, Sennert was sentenced to twelve months of unsupervised probation, with the condition that he pay a $1,000 fine and $822.80 in restitution to the government. *Id.* at 38.

The Magistrate Judge noted that the Sentencing Guidelines do not control this case. *Id.* at 4. The maximum punishment for each of the two counts is six months in custody, five years of probation, a $5,000 fine and a $20 statutory assessment. *Id.* The restitution amount reflected in the complaint is $1,237.05. *Id.*

On the issue of restitution, the defense gave the Magistrate Judge two documents: a document titled "Tioga Road Sewer Dump Charges," allegedly prepared by the maintenance department on November 14, 2014, and a page of Ranger Sprouse's report, prepared on October 6, 2014, which included an estimate of the number of hours each employee worked on the cleanup. *Id.* at 18, 21 & 30. The cleanup allegedly occurred on October 9, 2014. *Id.* at 21. The defense received these documents in discovery from the government, and believed that the government based its restitution calculations on the Tioga Road Sewer Dump Charges document. *Id.* at 18. The defense noted that the document contained a chart that categorized restitution costs into three categories: employee time, supplies used in the cleanup, and transportation costs. *Id.* The defense did not object to the listed costs of supplies, which totaled $106. *Id.* However, it did object to the costs of employee time and transportation. *Id.*

The defense then addressed the cost of employee time. *Id.* at 20. It argued that the documentation provided by the government was insufficient for two reasons. *Id.* First, the defense argued that the government should be required to prove that the employees working on the cleanup were actually diverted from work they would have otherwise completed, so Sennert should not have to pay the employees' hourly rates or the costs of their benefits per hour. *Id.* Second, the defense objected to the number of hours claimed and the hourly rates requested by the government. *Id.* The defense noted a discrepancy relating to the number of hours between the Tioga Road Sewer Dump Charges document and Ranger Sprouse's report. *Id.* at 21. The defense argued that the Magistrate Judge should use the figure listed in Ranger Sprouse's report, which was a total of sixteen hours of cleanup by Mr. Messik, Mr. Brown, Mr. Thomas and Mr. Hendy, rather than the 18.5 hours listed in the Tioga Road

11

Sewer Dump Charges document. *Id.* at 21. These costs, plus the cost of transportation and supplies, would total $212.40. *Id.* at 22. The defense also argued that the base salary rates (excluding benefits) were unknown because the government did not provide sufficient documentation, and therefore employee time should be excluded from restitution. *Id.*

As to the their first claim, in addition to the argument that the government should have to prove that the employees were actually diverted from other tasks, defense counsel argued that Sennert should not have to pay the costs of the employees' benefits because they would have received the benefits regardless of Sennert's actions. *Id.* at 22. The government responded that, because the employees were working on the cleanup, they were unable to complete other tasks. *Id.* at 23. Further, taxpayers pay for government employees' wages, and thus paid for Sennert's cleanup. *Id.* The government further argued that the public is paying for the employees' benefits, so the same principle should apply. *Id.* at 24. As to the discrepancy between the two documents, the government argued that Ranger Sprouse did not have access to the employees' billing files, so her estimates were only a "guesstimate," while the hours listed in the Tioga Road Sewer Dump Charges document were what were actually charged in the billing system. *Id.* at 27.

The Magistrate Judge accepted the defense's argument as to transportation costs. *Id.* at 34. In doing so, the Magistrate Judge stated that the value of the vehicles is the same regardless of their use. *Id.* The Magistrate Judge also accepted the defense's argument as to the employees' benefits because the benefits would have been incurred regardless of Sennert's actions. *Id.* at 35. However, the Magistrate Judge decided the time taken away from other work should be charged to Sennert. *Id.* The Magistrate Judge accepted the Tioga Road Sewer Dump Charges document as a "good faith representation by an officer of the court that that is his client's best record of what was spent, so it does have some credibility other than just being somebody's tally." *Id.* at 30. The Magistrate Judge further explained, "I would be inclined to assume a detailed accounting collected after the fact as compared to an informal inquiry, as I assume it was because it was just an estimate, would be more likely to be more accurate." *Id.* at 27.

The government claimed that the employees' hourly rates, excluding benefits and overhead, were: $28.20 for Messik, $25.57 for Hendy, $19.11 for Brown, and $36.64 for Thomas. *Id.* at 27.

Multiplying each rate by 1.5, the overtime wages per hour were $42.30, $38.35, $28.67 for Messik, Hendy, and Brown, respectively. *Id.* at 35-37. The Magistrate Judge based his calculation of the cost of employee time on these figures. *Id.* at 36. Calculations for the four employees were as follows: $211.50 for Messick, for three regular hours and three over time hours; $ 210.94 for Hendy, for three regular hours and 3.5 overtime hours; $114.69 for Brown for four overtime hours; and $73.28 for Thomas, for two regular hours. Thus, the cost of employee time totaled $610.40, and the total restitution, after adding the costs of transportation and cleanup supplies, was $822.80.

<div align="center">

**SENNERT'S CONVICTIONS**

</div>

**I. Standard of Review**

In a criminal appeal, an appellate court must "construe the evidence 'in the light most favorable to the prosecution,' and only then determine whether '*any* rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt.'" *United States v. Nevils*, 598 F.3d 1158, 1161 (9th Cir. 2010) (emphasis in original) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). After a conviction by a magistrate judge, "[t]he defendant is not entitled to a trial de novo by a district judge. The scope of the appeal is the same as in an appeal to the court of appeals from a judgment entered by a district judge." Fed. R. Crim. P. 58(g)(2)(D).

Rule 29 permits a defendant to move for an acquittal after the government closes its evidence. Fed. R. Crim. P. 29. A Rule 29 motion "is reviewed on a sufficiency-of-the-evidence standard." *United States v. Stoddard*, 150 F.3d 1140, 1144 (9th Cir. 1998). "Under that standard, evidence supports a conviction, if, viewed in the light most favorable to the government, it would allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." *Id.*; *United States v. Ross*, 112 F.3d 422, 425 (9th Cir. 1997).

**II. Discussion: Rule 29 Motions**

A. 36 C.F.R. § 2.14(a)(8)

Sennert argues that, at the close of the government's case, there was insufficient evidence of his responsibility for the spill to withstand the Rule 29 motion as to Count 1. Doc. 35 at 14. Moreover, Sennert argues that the government failed to present any evidence of his *mens rea*, an element he asserts is essential to this count. *Id.*

1    In order to establish a violation of 36 C.F.R. § 2.14(a)(8), the government must prove beyond a

2    reasonable doubt that: 1) in a developed area; 2) the defendant disposed of human body waste; and 3)

3    the location of the disposal was not designated for that purpose. *See* 36 C.F.R. § 2.14(a)(8).

4    The first and third elements of the offense are supported by facts to which the parties stipulated.

5    The turn-out where Sennert dumped sewage constitutes a "developed area" under 36 C.F.R. § 1.4(a),

6    which states that "[d]eveloped area means roads, parking areas, picnic areas, campgrounds, or other

7    structures, facilities or lands located within development and historic zones depicted on the park area

8    land management and use map." Furthermore, no evidence suggests that the turn-out was a site

9    designated for waste disposal.

10    Regarding the second element of the offense, the evidence presented by the government and

11    stipulated to by both parties was sufficient to lead a rational trier of fact to find that Sennert disposed

12    of human body waste at the turn-out.[4] Camp and Fox were parked behind Sennert's RV at the turn-out.

13    Doc. 14 at 2. There were no other RVs between Sennert's RV and Camp and Fox's vehicle. Doc. 16 at

14    44-45. Only a "small percentage" of vehicles traveling down Tioga Road are RVs. *Id.* at 31 & 83-84.

15    Camp testified that she saw a "stream" of sewage "flowing" from underneath and toward the left side

16    of Sennert's RV, which is where the RV's sewage valve is located. *Id.* at 41. Fox consistently testified

17    that he observed sewage "flowing" from underneath Sennert's RV. *Id.* at 61. Fox believed Sennert's

18    RV was the source of the sewage. *Id.* at 65. After Sennert left the turn-out, Camp and Fox saw sewage

19    on the ground where Sennert's RV had been parked. *Id.* at 42 & 61. When Ranger Sprouse inspected

20    the turn-out, she also observed a "stream" of what was "undeniably human sewage." *Id.* at 80.

21    However, although the sewage was flowing while Camp and Fox observed it under Sennert's RV, the

22    sewage was stationary when Ranger Sprouse observed it in the absence of the RV. *Id.* at 80. Ranger

23    Sprouse, who had experience investigating improper sewage disposal cases, formed the opinion that

24    Sennert was responsible for the spill. *Id.* at 81. Viewing the above evidence in the light most favorable

25    to the government, a rational trier of fact could find that Sennert's RV was the source of the sewage.

26    Furthermore, the Court is not persuaded by Sennert's *mens rea* argument. Although 36 C.F.R.

27

28    [4] As a matter of common sense, it is extremely unlikely that the source of the sewage spill at the turnout could be anything
other than an RV.

§ 2.14(a)(8) does not expressly include a *mens rea* requirement, Sennert argues that the phrase "disposed of" in the statute implies a required *mens rea* of intent. A plain reading of this regulation reveals no intent requirement. As of the date of this order, case law has not spoken to any required *mens rea* in the regulation.

Moreover, even if there were an intent requirement, the evidence is sufficient to satisfy it. "[C]ulpable intent … can be inferred from the defendant's conduct and from the surrounding circumstances." *United States v. Bucher*, 375 F.3d 929, 934 (9th Cir. 2004) (quoting *United States v. Hernandez-Franco*, 189 F.3d 1151, 1155 (9th Cir. 1999)). Camp was able to smell the waste from behind Sennert's RV with her window cracked. Doc. 16 at 40 & 49. Both Camp and Fox consistently testified that there was sewage underneath Sennert's RV. *Id.* at 42 & 61. Ranger Church observed approximately 500 square feet of sewage at the turn-out. *Id.* at 25. Yet, when Ranger Sprouse told Sennert of the allegations, his explanation of Camp and Fox's observations was that water was leaking from his RV, with no mention of sewage. *Id.* at 79. Sennert asserts that if the odor was as detectable at the first turn-out as Camp and Fox claim, Ranger Sprouse should have been able to detect it when she stopped Sennert. Doc. 35 at 10. However, given that the RV had traveled "quite a ways" from the first turn-out, it is reasonable to believe that sewage residue would have blown off the RV by the time Ranger Sprouse stopped Sennert. Doc. 16 at 87. A reasonable trier of fact could find that Sennert knew of the sewage exiting his RV, and was dishonest about his knowledge of it. Moreover, Sennert's suspicious conduct of leaving the turn-out in a hurry and rolling down his window in a way suggesting he wanted to talk to Camp and Fox lends further support to the inference that Sennert knew of the spill. *Id.* at 55. Given that this Court is required to draw all reasonable inferences from the facts in favor of the government, the conclusion that the sewage came from Sennert's RV along with the surrounding circumstances and his suspicious conduct could lead a rational trier of fact to infer that he intentionally disposed of the sewage. *United States v. Khatami*, 280 F.3d 907, 910 (9th Cir. 2002) (citing *United States v. Good*, 814 F.2d 1353 (9th Cir. 1987)).

Accordingly, viewing the evidence in the light most favorable to the government, a rational trier of fact could find beyond a reasonable doubt that all of the elements of 36 C.F.R. § 2.14(a)(8) are met. Therefore, the Magistrate Judge properly denied Sennert's Rule 29 motion as to Count One.

15

**B. 36 C.F.R. § 2.34(a)(4)**

Sennert further argues that the government failed to present sufficient evidence as to the source of the sewage at the turnout and as to Sennert's mental state for the Magistrate Judge to deny its Count Two Rule 29 motion. Doc. 35 at 14.

To establish a violation of 36 C.F.R. § 2.34(a)(4), the government must prove beyond a reasonable doubt that the defendant: 1) created or maintained; 2) a hazardous or physically offensive condition; and 3) intended to cause public alarm, nuisance, jeopardy, or violence or knowingly or recklessly created the risk thereof. For the purposes of 36 C.F.R. § 2.34(a)(4), "[a] person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct." *United States v. Albers*, 226 F.3d 989, 996 (9th Cir. 2000) (quoting Model Penal Code § 2.02(2)(c)). To satisfy this definition of recklessness, the Court must determine whether a rational trier of fact could find beyond a reasonable doubt that Sennert *consciously* disregarded the risk of public alarm and/or nuisance, *i.e.*, whether Sennert was aware of the risk he created by dumping the sewage in the manner done here. *Id.*

As discussed above, a rational trier of fact could find beyond a reasonable doubt that the sewage originated from Sennert's RV. Moreover, the sewage undoubtedly constituted a hazardous and physically offensive condition. This is evidenced by Ranger Church's decision to cordon off the spill area because the waste was "hazardous." Doc. 16 at 28-29. Further, the spill was "physically offensive" within the meaning of the regulation to the extent that Camp and Fox noticed the spill, and then went to considerable inconvenience to pursue Sennert and travel to the ranger station to make written statements because they believed he was responsible. Accordingly, the first two elements of 36 C.F.R. § 2.34(a)(4) are satisfied.

Sennert argues that the government failed to prove the third element of the offense by providing insufficient evidence of his recklessness in creating a risk of public alarm or nuisance. Doc. 35 at 14. Common knowledge dictates that dumping a large amount of sewage at a public turn-out in a National Park creates a substantial risk of public alarm and nuisance. This, by itself, could lead a rational trier of fact to conclude that Sennert was aware of the risk he created and subsequently

disregarded. An experienced RV owner such as Sennert would certainly be aware of the risk created by dumping sewage in the manner described here. Moreover, Sennert's testimony that he always dumps sewage at designated dump locations, and even pays to use them, suggests that he knows the danger of dumping sewage and how strictly it is regulated. Doc. 16 at 101-02 & 112. Thus, a rational trier of fact could find that Sennert consciously disregarded the substantial and unjustifiable risk that dumping sewage would cause public alarm and/or nuisance. *See Khatami*, 280 F.3d at 910.

Accordingly, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could find beyond a reasonable doubt that each of the elements of 36 C.F.R. § 2.34(a)(4) are satisfied. Therefore, the Magistrate Judge properly denied Sennert's Rule 29 motion as to Count Two.

**III. Discussion: Post-Trial Convictions**

Sennert additionally contends that the evidence presented at trial is insufficient to sustain convictions for violating both counts. Doc. 35 at 8 &13. The discussion of this issue requires the same analyses above as pertaining to the Rule 29 motion, with the addition of evidence presented subsequent to the denial of the Rule 29 motion.

A. 36 C.F.R. § 2.14(a)(8)

Sennert argues that the evidence presented at trial is insufficient for a rational trier of fact to conclude that the sewage at the turn-out originated from his RV. Doc. 35 at 11. Moreover, Sennert argues that he did not possess the requisite *mens rea*. *Id.* As discussed above, although 36 C.F.R. § 2.14(a)(8) does not expressly include a *mens rea* requirement, Sennert argues that the phrase "disposed of" in the statute implies a required *mens rea* of intent.

In order to establish a violation of 36 C.F.R. § 2.14(a)(8), the government must prove beyond a reasonable doubt that: 1) in a developed area; 2) the defendant disposed of human body waste; and 3) the location of the disposal was not designated for that purpose.  36 C.F.R. § 2.14(a)(8).

As evidence of innocence, Sennert points to his testimony relating to the reason he was stopped at the turn-out, his certainty that his sewage tank was empty, the reasons why he would not have traveled with anything in his sewage tank, and his lack of motive for dumping sewage roadside. Doc. 35 at 9. However, in his Memorandum and Opinion, the Magistrate Judge raised a number of valid questions that cast considerable doubt as to the credibility of Sennert's testimony:

A) Why would one so concerned, as he claimed to be, about the danger and costs of unnecessarily carrying extra weight in his waste storage tank carry an over-filled, 175-gallon, fresh water tank when, as he testified, there was fresh water available where he was going? B) Why would one as trailer safety conscious and experienced as Sennert described himself to be, be willing to continue traveling down a known extremely steep and windy descent with a loose electrical connection, which disconnected itself at least twice in a stretch of about five miles, and had the potential of leaving him dependent on truck brakes to slow or stop the very heavy and large trailer packed with an ATV and camping gear for eight? C) Is it not somewhat incredible to believe that Sennert needed to stop and reconnect his electrical line just exactly at the point where the people following and photographing him were passing him? And, D) Why does one pulling over to check a dangerously loose electrical connection need to first roll down his window and look as if he wanted to talk to individuals who had been photographing him? And, E) Why would one discharging black water from the RV's storage tank expect sewage to have splattered on him when he would have had to move some six to eight feet away from the discharge outlet to release the lever that allowed the discharge to flow out?

Doc. 17 at 8. As is required, this Court will defer to the Magistrate Judge's determinations of credibility. *See Khatami*, 280 F.3d at 910. Accordingly, Sennert's testimony does not change the conclusion that a rational trier of fact could find that the sewage at the turn-out originated from Sennert's RV.

Sennert further argues that had he dumped sewage, it would have created an "enormous mess all over [his] RV," which Ranger Sprouse would have been able to detect during her stop of Sennert. Doc. 35 at 9; Doc 16 at 117.  However, as discussed above, it is reasonable to believe that during the time between Sennert's stop at the first turn-out and his encounter with Ranger Sprouse any sewage residue would have blown off of the RV. Given that Sennert's testimony does not change the conclusion that the sewage originated from his RV, the Court must next determine whether his testimony reflected any intent to remove sewage from his RV.

The Court finds that Sennert's testimony actually supports the conclusion that he intended to dispose of the sewage at the turn-out. The multiple, purposeful steps that Sennert asserted must be taken to release sewage from the RV strongly suggests that the disposal was no accident. Doc. 16 at 99-100. Moreover, Sennert's concerns about the weight of his vehicle and the costs of traveling with sewage provide a motive for lightening the RV by disposing of sewage. *Id.* at 141. Sennert's testimony, along with his suspicious conduct and the surrounding circumstances, could lead a rational trier of fact to find that Sennert intended to dispose of the waste at the turn-out.

18

1    As discussed above, the first and third elements of the offense are satisfied. Sennert's testimony

2    does not undermine the conclusion Sennert intentionally disposed of sewage at the turn-out.

3    Accordingly, a rational trier of fact could find beyond a reasonable doubt that all of the elements of 36

4    C.F.R. § 2.14(a)(8) are met.

5         **B. 36 C.F.R. § 2.34(a)(4)**

6         Sennert argues that the government failed to present sufficient evidence as to the source of the

7    sewage at the turnout and as to Sennert's mental state. Doc. 35 at 13.

8         The government must prove beyond a reasonable doubt that the defendant: 1) created or

9    maintained; 2) a hazardous or physically offensive condition; and 3) intended to cause public alarm,

10   nuisance, jeopardy, or violence or knowingly or recklessly created the risk thereof. 36 C.F.R.

11   § 2.34(a)(8). As noted above, for the purposes of 36 C.F.R. § 2.34(a)(4), "[a] person acts recklessly

12   with respect to a material element of an offense when he consciously disregards a substantial and

13   unjustifiable risk that the material element exists or will result from his conduct." *Albers*, 226 F.3d

14   996. As discussed above, the first two elements of the offense are satisfied here.

15        Regarding the third element, Sennert's testimony supports the conclusion that he was aware of

16   and disregarded the substantial and unjustifiable risk of creating a hazardous and/or physically

17   offensive condition by disposing sewage at the turn-out. Sennert described himself as an "extremely"

18   experienced RV owner. Doc. 16 at 102. This, along with common knowledge, suggests that Sennert

19   was certainly aware of the risk. Moreover, Sennert's testimony that he would not want to be "anywhere

20   near" sewage dumped roadside because it "would be rather ugly" is further evidence he was aware of

21   the risk of public alarm and/or nuisance. Doc. 16 at 112. Because Sennert disregarded the risk, his

22   actions meet the *mens rea* requirement of recklessness. Accordingly, a rational trier of fact could find

23   that Sennert consciously disregarded the substantial and unjustifiable risk that dumping sewage would

24   cause public alarm and/or nuisance.

25        By disposing of sewage at the public turn-out, Sennert created a hazardous and physically

26   offensive condition. Because he consciously disregarded the risk that creating the condition would

27   create, Sennert acted recklessly. Accordingly, viewing the evidence in the light most favorable to the

28   prosecution, a rational trier of fact could find beyond a reasonable doubt that each of the elements of

1  36 C.F.R. § 2.34(a)(4) are satisfied.

2  <center>**RESTITUTION**</center>

3  **I. Standard of Review**

4  "The legality of an order of restitution is reviewed *de novo*, and factual findings supporting the

5  order are reviewed for clear error." *United States v. Brock-Davis*, 504 F.3d 991, 996 (9th Cir. 2007)

6  (citing *United States v. Hackett*, 311 F.3d 989, 991 (9th Cir. 2002), and *United States v. Stoddard*, 150

7  F.3d 1140, 1147 (9th Cir. 1998)). "Provided that it is within the bounds of the statutory framework, a

8  restitution order is reviewed for abuse of discretion." *Id.* (citing *Hackett*, 311 F.3d at 991, and

9  *Stoddard*, 150 F.3d at 1147). Under this standard, the Court gives great deference to the findings of the

10  Magistrate Judge. *See, e.g.*, *United States v. Pathania*, No. CR-F-08-009 OWW, 2008 WL 3876283, at

11  *1 (E.D. Cal. Aug. 20, 2008). The Magistrate Judge abused his discretion only if he failed to identify

12  the correct legal rule to apply to the relief requested, or if his "application of the correct legal standard

13  was (1) 'illogical,' (2) 'implausible,' or (3) 'without support in inferences that may be drawn from the

14  facts in the record.'" *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc) (quoting

15  *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 577(1985)).

16  **II. Discussion**

17  The parties dispute the amount of restitution awarded by the Magistrate Judge. The defense

18  requests that the Court remand this case for a new hearing as to the issue of restitution. Doc. 35 at 18.

19  The government asks that Defendant's request for remand be denied. Doc. 39 at 21.

20  "Federal courts have no inherent power to award restitution, but may do so only pursuant to

21  statutory authority." *United States v. Follet*, 269 F.3d 996, 998 (9th Cir. 2001). 18 U.S.C. § 3664

22  provides the procedures that federal courts must follow in ordering restitution. *See id.* While courts

23  have a degree of flexibility in determining the amount of restitution, "[section] 3664 minimally

24  requires that facts be established by a preponderance of the evidence, and the district court [may] only

25  utilize evidence that possesses 'sufficient indicia of reliability to support its probable accuracy.'"

26  *United States v. Waknine*, 543 F.3d 546, 557 (9th Cir. 2008) (citing *United States v. Garcia-Sanchez*,

27  189 F.3d 1143, 1148-49 (9th Cir. 1999)); *see also United States v. Tsosie*, 639 F.3d 1213, 1221 (9th

28  Cir. 2011) ("the evidence supporting a district court's restitution order must meet a threshold level of

<center>20</center>

1  adequacy."). Relevant here, the Court finds persuasive the First Circuit's rule articulated in *United*

2  *States v. Savoie*, 985 F.2d 612, 617 (1st Cir. 1993) that this standard should be applied in a "practical,

3  common-sense way."

4      Under § 3664(e), any dispute as to the proper amount of restitution must be "resolved by the

5  court by the preponderance of the evidence," and the "burden of demonstrating the amount of the loss

6  sustained by a victim as a result of the offense shall be on the attorney for the Government." The Ninth

7  Circuit has read the burden language less than literally, explaining that the restitution amount is

8  justified "[s]o long as the district court orders defendants to pay restitution only after *someone* proves

9  the amount by a preponderance of the evidence." *Tsosie*, 639 F.3d at 1221 (emphasis in original)

10  (citing *United States v. Gamma Tech Indus., Inc.*, 265 F.3d 917 (9th Cir. 2001)).

11      Sennert claims the Magistrate Judge improperly determined the amount of restitution by

12  including the cost of lost employee time in its calculations. Doc. 35 at 16. However, the fact that the

13  employees spent time cleaning up the waste establishes that employee time was lost. The Court finds

14  that the Magistrate Judge's decision to include lost employee time was neither (1) illogical, (2)

15  implausible, or (3) without support in inferences that may be drawn from the facts in the record.

16  *Hinkson*, 585 F.3d at 1262.

17      Sennert further argues that the Magistrate Judge erred in relying on the Tioga Road Sewer

18  Dump Charges document when determining the amount of restitution awarded for lost employee time.

19  Doc. 35 at 16. Sennert relies on *Tsosie*, where the Ninth Circuit held that the district court erred in

20  awarding restitution because it based restitution on nothing more than a spreadsheet, and failed to

21  explain its reasoning. *See* 639 F.3d at 1223. The Court does not find Sennert's reliance on *Tsosie*

22  persuasive. *Tsosie* held that the spreadsheet was an inadequate evidentiary basis to support the

23  restitution award because it was not supported by an affidavit explaining how the expenses were

24  "directly related to the instant offense." *Id.* at 1222. Here, there is no issue as to whether the expenses

25  were related to the cleanup. The evidence demonstrates that four maintenance employees—Messick,

26  Brown, Hendy, and Thomas—cleaned up the sewage dumped by Sennert. Doc. 35-1, Exs. A, B.

27  Ranger Sprouse listed these names in her signed report, and these same names appear on the Tioga

28  Road Sewer Dump Charges document. *See id*. Moreover, the Magistrate Judge explicitly explained his

1   reasoning for relying on the Tioga Road Sewer Dump Charges document rather than Ranger Sprouse's
2   report when he accepted the document as a "good faith representation by an officer of the court that
3   that is his client's best record of what was spent, so it does have some credibility other than just being
4   somebody's tally." Doc. 29 at 30. The Magistrate Judge further explained: "I would be inclined to
5   assume a detailed accounting collected after the fact as compared to an informal inquiry, as I assume it
6   was because it was just an estimate, would be more likely to be more accurate." *Id.* at 27. The Court
7   thus finds that the Tioga Road Sewer Dump Charges document therefore meets the "threshold level of
8   adequacy" required to support a restitution order. *See Tsosie*, 639 F.3d at 1221. The Magistrate Judge's
9   decision to rely on the Tioga Road Sewer Dump Charges document was neither (1) illogical, (2)
10  implausible, or (3) without support in inferences that may be drawn from the facts in the record.
11  *Hinkson*, 585 F.3d at 1262.

12      Lastly, Sennert argues that the Magistrate Judge erred in relying on the government's proffer as
13  to the employees' base salary rates (not including benefits). Doc. 35 at 17. Citing *Waknine*, 543 F.3d at
14  447, for the principle that the government must present "evidence that possesses sufficient indicia of
15  reliability to support is probable accuracy" to meet its burden, Sennert claims the government's proffer
16  did not constitute accurate and reliable evidence to support its request for restitution. *Id.* at 15 & 17.

17      The Court does not agree. Regarding Sennert's argument that the Magistrate Judge erred in
18  relying on the government's proffer as to the base salary rates, the Court notes that in *Pathania*, 2008
19  WL 3876283, at *5, another court in this district rejected the appellant's argument that a restitution
20  order was not supported by a preponderance of the evidence because the government did not elicit
21  specific testimony or documentary evidence of a victim's wages. *Id.* at *3. The court reasoned,
22  "[a]lthough the record would be more complete had the United States produced documentary evidence
23  … hearsay evidence and reasonable approximation of the loss may sustain a restitution order." *Id.* at
24  *5. The Court finds that *Pathania*'s reasoning is both sound and applicable in this case. Here, Sennert
25  argues that the government's failure to provide a witness and documentation to support the revised
26  hourly rates renders its proffer inadequate. Doc. 40 at 8. Upon review of the sentencing transcript, the
27  Court notes that the Magistrate Judge called a recess to give all parties some time to work through the
28  restitution issue. Doc. 29 at 25-26. After the recess, the government indicated to the Magistrate Judge

1    that it had "quite a bit of information," including the base salary rates for each employee. *Id.* at 26-27.

2    The government also indicated that it relied upon the Tioga Road Sewer Dump Charges document,

3    which "is what was actually charged in the billing system," in setting forth the base salary rates. *Id.* at

4    27. As discussed above, the Court found that the Tioga Road Sewer Dump Charges document to be of

5    sufficient reliability for purposes of determining restitution. *See Tsosie*, 639 F.3d at 1221.Therefore,

6    the Court finds that the Magistrate Judge was entitled to rely on his own experience and knowledge in

7    accepting government's proffer as a common-sense, reasonable approximation of the actual base salary

8    rates. *See id.*; *accord Savoie*, 985 F.2d at 617 ("So long as the basis for reasonable approximation is at

9    hand, difficulties in achieving exact measurements will not preclude a trial court from ordering

10   restitution."). Accordingly, in accepting the government's proffer as to base salary rates excluding

11   benefits, the Magistrate Judge's decision was neither (1) illogical, (2) implausible, or (3) without

12   support in inferences that may be drawn from the facts in the record. *Hinkson*, 585 F.3d at 1262.

13        The Magistrate Judge did not err by including lost employee time in restitution, accepting the

14   Tioga Road Sewer Dump Charges document, or accepting the government's proffer as reasonable

15   approximations of base salary rates minus benefits. Accordingly, the Magistrate Judge properly

16   determined the amount of restitution.

17                              **CONCLUSION AND ORDER**

18        This Court does not find error with respect to any of the grounds of review raised by Sennert.

19   First, the Magistrate Judge correctly denied Sennert's Rule 29 Motions. Second, there was sufficient

20   evidence for a rational trier of fact to find Sennert guilty of 36 C.F.R. §§ 2.14(a)(8) and 2.34(a)(4).

21   Finally, the Magistrate Judge properly determined the amount of restitution.

22        Accordingly, IT IS HEREBY ORDERED that Appellant's grounds for review are DENIED

23   and the judgment of the Magistrate Judge is AFFIRMED.

24   IT IS SO ORDERED.

25   Dated:   **July 22, 2016**                    **/s/ Lawrence J. O'Neill**

26                                        UNITED STATES CHIEF DISTRICT JUDGE

27

28